

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-22-00165-CR

CHARLES GARTON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 102nd District Court
Bowie County, Texas
Trial Court No. 18F0532-102

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens

MEMORANDUM OPINION

On May 22, 2019, a Bowie County jury convicted Charles Garton of two counts of aggravated sexual assault of a child, Susan,[1] who was under fourteen. *See* TEX. PENAL CODE ANN. § 22.021. At punishment, the jury assessed a sentence of eighty years' imprisonment for each count, with the sentences to run consecutively.

On appeal, Garton raises two bases for reversal: (1) his trial counsel was ineffective, and (2) the trial court erred by denying his motion for new trial. Upon review, we find that Garton was not prejudiced by any alleged ineffective assistance and that the trial court did not abuse its discretion by denying Garton's motion for new trial. As a result, we affirm.

## I.      Factual Background

### A.      Investigation of Littleton[2] and Garton

The Texas Department of Public Safety (DPS) began investigating Garton as a part of a larger investigation against another individual, John Littleton. Garton and Littleton lived together in New Boston, Texas, at 102 Meadow Drive from June 2017 until April 2018. Prior to June 2017, they had lived together in different locations for approximately thirteen years.

Officer Briscoe Davis of the DPS testified at Garton's trial regarding the investigation:

> Well, in 2017 I was asked to help with the investigation of John Littleton and another person. And I began looking into them having sexually assaulted young girls from the age of 11 up, and it just progressed from there. As I started doing surveillance on a house where I knew that they were going and where they met several of the victims and had sex with some of the victims[,]

[1]We use pseudonyms to protect the identity of "any person who was a minor at the time the offense was committed." TEX. R. APP. P. 9.10(a)(3).

[2]Littleton died after charges were brought against him.

2

I started becoming aware of Mr. Garton being over there as well. And he came on the radar as I was watching Littleton.

**B.      Garton's Interviews**

As a result of his association with Littleton, the DPS became interested in Garton and noticed that he had a close relationship with a minor living with him:

Well, he wasn't on the radar at first, so then I started seeing [Garton] was . . . spending time with the 11-year old. I actually saw him come out, they stood around the car and chatted a whole bunch. She pretended to drive his truck . . . he actually got in the truck, put her in his lap and let her drive his vehicle . . . . I just did - - did not seem at all right or normal with a 39-year old and a 11-year old.

Based upon their interest in Garton, the DPS investigated him in 2017 and 2018 and interviewed him four times as a part of their investigation. The third and fourth interviews were recorded.

On April 24, 2018, the DPS followed Garton to the Pitt Grill restaurant in New Boston, and Garton consented to an interview. During that interview, Garton discussed sisters, Susan and Sarah, who lived with him. Garton stated that the sisters moved into his and Littleton's house "because basically their guardians couldn't take care of them."

Garton characterized his relationship with the girls as being a "father relationship" wherein "[h]e took care of them, clothed them, bought them their cell phones, and stuff like that." The girls had a bedroom, but Garton stated Susan, the younger of the two sisters at twelve years old, "most often" slept in his room and not her own room. After an hour or so, the initial interview was terminated, and the DPS started the second interview of Garton. The second interview lasted an additional three hours and thirteen minutes. During that longer interview,

3

which was not recorded, Garton confessed to penetrating Susan's vagina for "about five minutes."

Later that day, and to follow up on Garton's statements, the DPS interviewed Garton a third time at his home. That interview was recorded, and the recording was admitted into evidence during Garton's trial. That recording captures the DPS officers reading Garton his *Miranda*[3] rights. A low-speaking Garton then explained his conduct, which he characterized as "embarrassing"; stated that he did not "want to go to jail or prison"; and stated that "the only thing [he] did was touch[] [Susan] one time."

During that "one-time" incident, Garton admitted to penetrating Susan's vagina with his middle finger. Garton stated that the incident happened two to three weeks prior to the interview. Garton said the sexual contact with Susan began because he "had asked to see her boobs" repeatedly, and she finally agreed. He admitted that he "touched [Susan's breasts] a little bit." He also added that he "cared a lot about her" and wanted to be clear that he ensured she was comfortable with the contact. He stated in the recording that he felt "ashamed" about it because he felt "like a child molester." He also admitted that he knew Susan was twelve years old at the time of that interview.[4] By the end of the recorded interview, Garton was worried about when the DPS would arrest him.

---

[3]*Miranda v. Arizona*, 384 U.S. 436 (1966).

[4]By the time of trial, Susan was thirteen years old.

After the recorded interview ended, Garton also admitted to conducting oral sex on Susan. The exchange at trial between the Bowie County prosecutor and the DPS officer detailed that admission as follows:

> Q. Does [Garton] make any other admissions of any other types of sexual assaults during this interview?
>
> A. Yes, he did.
>
> Q. What was that?
>
> A. He conducted oral sex.
>
> Q. Did we hear on the video that we just heard him say that he put his mouth on her vagina?
>
> A. No.
>
> Q. Do you know why that portion of the interview is not on the recording?
>
> A. Because now I know you need to put your phone in airplane mode when you set it on video camera, and I was getting calls and texts during this investigation so it interrupted me.
>
> Q. But after - - after what we just viewed in time after that, at the end of that video, Mr. Garton did indicate that he put his mouth on [Susan's] vagina?
>
> A. Yes.

The next day, on April 25, 2018, the DPS arrested Garton and transported him to be interviewed for a fourth time. Davis conducted the fourth interview, and it lasted "45 or 43 minutes" in total. Davis read Garton his *Miranda* rights prior to that fourth interview. The State admitted a recording of that interview during the trial.

In that interview, Garton explained his sexual contact with Susan. He "started out maybe just kissing her." Then, the relationship advanced to where he "touched her boobs," and that eventually lead to him "touching her down there." Garton stated that his sexual relationship with Susan had been ongoing for three weeks and that Susan had slept in the bed with him "maybe a max of 7–8 times." Garton said that, despite Susan sleeping in bed with him, there were only "two times of sexual contact" with Susan. During one instance, Garton "performed oral sex on [Susan]." In the other, Garton "put his finger in [Susan's] vagina."

### C. Susan's Interviews

On April 24, 2018, the same day Garton was interviewed initially, Susan was interviewed two times and examined once. Susan was initially interviewed at the Children's Advocacy Center at around 10:00 a.m. for approximately forty-five minutes. Thereafter, Susan was interviewed at CAC around 3:00 p.m. for an additional twenty-five minutes. Finally, Susan was examined and interviewed by Sexual Assault Nurse Examiner (SANE) Kathy Lach.

During her first two interviews, Susan denied Garton had inappropriately touched her. Susan testified at trial that she denied being touched at those first two interviews because she had made a "pinky promise" to Garton that she would not tell anyone.

After she was interviewed twice at CAC, Lach spoke with Susan as a part of the SANE examination. During that examination, Susan admitted to Lach that Garton touched her vagina:

> Q. Okay. What statements did she make about sexual abuse?
>
> A. She told me that three weeks ago [Garton] put his finger in my va-jj at his - - at home in his room. And then she - - we always - - because we write whatever the patient tells us, we use an anatomical drawing of the - - of a female and a male. And we will - - if they say anything that we're not sure what they

6

mean by, I'll say can you tell me what area you're talking about. So, she indicated it was the female vagina and I labeled that on the anatomical drawing.

**D.      Trial Proceedings**

Susan and Garton both testified at trial. Both of Garton's recorded interviews were also admitted during the trial. Susan testified that Garton touched her breasts "[a] lot of times." Susan also testified about the incident wherein Garton touched her vagina: "He put his hands down my pants, and, like he just put his fingers in my vagina." Susan said Garton then "pulled [her] pants down and put his mouth down there." According to Susan, Garton tried to have sex with her, but she "said no." Thereafter, she left Garton's room.

Garton testified at trial. During his testimony, Garton recanted his earlier statements and denied touching Susan inappropriately. When Garton was asked if he "ever touch[ed] [Susan] inappropriately," he replied, "No, sir." Garton testified that he admitted to touching her inappropriately in the prior interviews with law enforcement because he "felt nervous." He described the pressure from law enforcement during his testimony: "I kind of felt like if I didn't say something then I wasn't going to be able to go home or because basically they done told me what John [Littleton] had been doing. He was - - he was in quite a bit of trouble and then I was going to be, too." Because of that pressure, he claims, he "[t]old them what they wanted to hear."

**II.      Analysis**

**A.      Garton Was Not Prejudiced by His Trial Counsel's Representation**

Garton raises fifteen specific instances of ineffective assistance of counsel. Because we find no prejudice under *Strickland*, we find no basis for reversal on this issue.

## 1. Standard for Ineffective Assistance

Pursuant to the Sixth Amendment, an accused is guaranteed the right to effective assistance of counsel. U.S. CONST. amend. VI. The standard for assessing an ineffective assistance of counsel claim is *Strickland v. Washington*, 466 U.S. 668 (1984), and the same standard applies to ineffective assistance of counsel claims in Texas. *See Hernandez v. State*, 726 S.W.2d 53, 55 (Tex. Crim. App. 1986).

Under *Strickland*, to prove his counsel was ineffective, Garton must make two showings: (1) that his trial counsel's performance was deficient and (2) that he was prejudiced as a result of his counsel's performance. *See McFarland v. State*, 928 S.W.2d 482, 500 (Tex. Crim. App. 1996) (per curiam), *overruled on other grounds by Mosley v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998). To show deficient performance, he must prove his counsel's actions fell "below the professional norm for reasonableness." *Id.* To show prejudice, he must show "that there is a reasonable probability that[,] but for counsel's [errors,] the result of the trial would have been different." *Id.*

## 2. Alleged Errors by Garton's Trial Counsel

Garton claims that his trial counsel was ineffective in the following fifteen ways: (1) by failing to object to the State's comment during voir dire about his right to remain silent, (2) by failing to object to the State's comment about sentencing during voir dire, (3) by failing to object to the pseudonym of "Child Victim #3," (4) by failing to object to the State's statement, during opening, about "three actors" who were non-parties, (5) by failing to object to the State's witness's suggestion that Garton might have tested positive for drug use during his probation,

(6) by failing to object to the State's questioning regarding an investigation of two other individuals who were non-parties, (7) by failing to object to the State's reference to a non-party as "their other co-defendant," (8) by failing to object to the State's comments directly to Garton, (9) by failing to object to the State's questioning of its witness as to a "ring" or conspiracy involving Garton and others, (10) by failing to object to questioning of Garton's sister implying an improper relationship, (11) by failing to object to the State's closing argument implying multiple victims, (12) by failing to object to the State's comment about living in that environment, (13) by not challenging for cause Venireperson 1 during voir dire, (14) by not objecting to the State's witness's testimony as to "two victims," and (15) by failing to request a jury instruction under Articles 38.21 and 38.22, Section 6, of the Texas Code of Criminal Procedure.

Based upon our review of these claims, we assume without deciding that the first prong of *Strickland* has been satisfied and will only consider the second prong of *Strickland*, whether Garton was prejudiced as a result of the error we assume. Because we find that he was not prejudiced, we affirm.

### 3.      Prejudice Analysis

Garton must "affirmatively prove prejudice from" his "counsel's deficient performance." *Mitchell v. State*, 989 S.W.2d 747, 748 (Tex. Crim. App. 1999). There are three exceptions to this requirement of affirmative proof, and prejudice is presumed if (1) "the complete denial of counsel" occurs "at a critical stage" of trial, (2) "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," *United States v. Cronic*, 466 U.S. 648, 659

9

(1984), and (3) circumstances at trial were such that, although counsel was available to assist the defendant during trial, "the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial," *id.* at 659–60 (citing *Powell v. Alabama*, 287 U.S. 45 (1932)).

Here, Garton does not claim, and we do not find, that prejudice should be presumed under *Cronic.* Accordingly, we consider whether he has affirmatively established prejudice. To affirmatively establish prejudice, Garton must show the following: "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Hernandez*, 726 S.W.2d at 55 (quoting *Strickland*, 466 U.S. at 694)). According to *Strickland*, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

In this case, Garton has not made the requisite showing of prejudice. The State introduced two different recordings of Garton admitting to the two counts of sexual assault that the State charged in the indictment. Those recordings are consistent with each other and detail his abuse of Susan. They are also credible and reflect his remorse and his feeling of being "ashamed." Susan herself testified at trial, and her testimony was consistent with Garton's confessions. Her testimony alone as a child victim under seventeen years of age is sufficient to support this conviction. *See* TEX. CODE CRIM. PROC. ANN. art. 38.07(a), (b) (recognizing a conviction under Section 22.021 of the Texas Penal Code "is supportable on the uncorroborated testimony of the victim of the sexual offense" even when the victim did not "inform another

10

person" within one year after the date of the offense where the victim is "[seventeen] years of age or younger").

Although Garton later claimed at trial that his confessions were coerced, a jury reasonably could have concluded that his prior confessions were valid and that he only retracted those statements to avoid the penalty of his actions. In both recordings, Garton speaks freely, in a relaxed manner, and gives no indication of being pressured. The strength of this evidence undermines any claim Garton has of prejudice. *See Strickland*, 466 U.S. at 696 (recognizing "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support"). As a result, we find Garton has not demonstrated that, "but for [his] counsel's unprofessional errors, the result of the proceeding would have been different" under the second prong of *Strickland*. *Id.* at 694.

### B.     Trial Court Did Not Abuse Its Discretion—Motion for New Trial

Garton timely filed a motion for new trial. In his motion, Garton argued the following:

> The Defendant in this case should be granted a new trial in this case because the actions of a third party, namely John Littleton, were introduced in an effort to tarnish the case against the defendant and prejudice the jury against him. There was no evidence of the Defendant's participation in, or promotion of human trafficking, however the State urged and argued that the Defendant was part and parcel of that criminal enterprise because of his mere presence in the household of John Littleton. Statements used during closing argument claiming that the Defendant is the last of a ring of criminals, etc. amounting to prosecutorial misconduct.

There was no hearing on this motion for new trial, and it was overruled as a matter of law. *See* Tex. R. App. P. 21.8(c).

11

We review the trial court's ruling on a motion for new trial under an abuse-of-discretion standard. *See Smith v. State*, 286 S.W.3d 333, 339 (Tex. Crim. App. 2009) (citing *Wallace v. State*, 106 S.W.3d 103, 106 (Tex. Crim. App. 2003)). Based upon the record, we cannot find that the trial court abused its discretion in denying Garton's motion for new trial. As stated previously, on the issue of Garton's guilt or innocence, the State included two recordings of Garton's confession and admitted Susan's testimony. This "reasonable view of the record . . . support[s] the trial court's ruling." *Webb v. State*, 232 S.W.3d 109, 112 (Tex. Crim. App. 2007) (recognizing a "trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling). Accordingly, we affirm.

## III. Conclusion

We affirm the trial court's judgment.


Scott E. Stevens
Chief Justice


Date Submitted:     December 27, 2023
Date Decided:       February 23, 2024

Do Not Publish

12